S. Leonard Ginsberg et al. v. Coating Products, Inc., et al.

King, C. J., Murphy, Alcorn, Comley and Shannon, Js.

Argued April 7—decided May 25, 1965

*Allyn L. Brown, Jr.,* with whom, on the brief, was *Leo J. McNamara,* for the appellants (defendants).

*Valentine J. Sacco,* for the appellees (plaintiffs).

SHANNON, J. The defendants have appealed from a judgment directing them to proceed with arbitration in order to ascertain the value of the stock of Coating Products, Inc. Prior to February 20, 1957, the plaintiff S. Leonard Ginsberg was connected with the G. and T. Manufacturing Company, and the defendants Reynold H. Goodman and Myron M. Mainthow were officers of the Crystal Transparent Corporation. On that date the two corporations merged. Crystal Transparent Corporation purchased a half interest in the merged company, which later changed its name to Coating Products, Inc. There are presently issued and outstanding 9600 shares of stock of Coating Products, Inc., the ownership of which is divided equally among the "Family Units"[1] of Ginsberg, Trehub, Mainthow and Goodman, the latter two holding their shares through their interest in the Crystal Transparent Corporation. When the companies were combined, the parties executed a stockholders' agreement providing the conditions and obligations under which

---

[1] "Family Unit" was defined by the parties as including the named male, i.e., Ginsberg, Mainthow, Trehub and Goodman, "his wife, their children and children-in-law."

the stock could be sold or transferred. In light
of these restrictions and covenants, the parties
agreed in paragraph 11 as follows: "The price to
be paid for any stock of the Corporation purchased
hereunder shall be based on its value per share, as
set forth in the latest Certificate of Value signed
by Leonard Ginsberg, George J. Trehub and Crys-
tal. In the event Crystal's stock of the Corporation
is distributed to Goodman and Mainthow and/or
their respective Family Units, then Reynold H.
Goodman and Myron M. Mainthow shall sign such
Certificates of Value in lieu of Crystal. The parties
agree that the present value of one share of the
common stock of the Corporation is $62.50. Begin-
ning on or about January 15, 1958 and annually
thereafter, the proper parties shall sign a new Cer-
tificate of Value; but the failure to sign any such
Certificate shall not invalidate the value set forth
in the last Certificate so signed. By mutual agree-
ment, the proper parties may sign similar Certifi-
cates at more frequent intervals. A copy of each
such Certificate so signed shall be kept by each of
the signers and filed with the Corporation."

Since the initial certificate of value was issued in
1957, two others have been signed, the last being on
January 1, 1960, valuing each share of stock at $105
per share. Although the plaintiffs have requested
it, no certificate of value has been signed since 1960
because the parties could not agree on the value of
each share at any given time.

On December 12, 1963, Ginsberg, on behalf of
himself and his wife, the plaintiff Goldie Ginsberg,
made a formal demand on the other stockholders
for a new certificate of value. The defendants
offered to sign a new certificate of value with a
valuation of $115 per share; the plaintiffs refused

because they did not believe that this was a fair value.

In their agreement, the parties provided in paragraph 20, in part, that "[a]ny controversy arising under or pertaining to this Agreement, or the interpretation, performance or breach of any provision thereof, shall be submitted to and determined by arbitration, unless relief is sought pursuant to the provisions of Paragraph 16."[2] The question is whether, under the circumstances here, "[a]ny controversy", as that term is used in paragraph 20 and the agreement as a whole, includes the present dispute over the certificate of value.

The defendants argue that as a matter of law, "controversy" does not include mere valuations or appraisals. They cite for support the construction of a New York arbitration statute at a time when it was similar to our present § 52-408. *Matter of Fletcher*, 237 N.Y. 440, 448, 143 N.E. 248. The *Fletcher* case has been followed in this state in *Mott v. Gaer Bros., Inc.*, 22 Conn. Sup. 449, 454, 174 A.2d 549. On two separate occasions, the New York legislature has nullified judicial constructions of the arbitration statutes which would have limited the scope of the term "controversy". Cf. N.Y. Civ. Prac. Act §§ 1448, 1340; note, "Arbitration as a Means of Settling Disputes within Close Corporations," 63 Colum. L. Rev. 267, 269-72. The legislative history of § 52-408 reveals nothing which would indicate an intent to give the word "controversy" a narrower meaning than its normal connotation. In the case at bar, under the court's order, the arbitrators would have to determine not only the ultimate

---

[2] Paragraph 16 gives a remedy by way of an action for specific performance in the event that "any controversy arises concerning the right or obligation to purchase or sell any of the stock."

value of each share but also the method to be used in determining that value. In this respect, alone, the dispute here is not merely a controversy over a simple appraisal. It is a genuine, bona fide dispute between the signatories of the stockholders' agreement and well within the meaning of § 52-408.

This court approves of arbitration. It is intended to avoid the formalities, delay, expense and vexation of ordinary litigation. *Colt's Industrial Union* v. *Colt's Mfg. Co.,* 137 Conn. 305, 309, 77 A.2d 301; *In re Curtis-Castle Arbitration,* 64 Conn. 501, 511, 30 A. 769. No one can be forced to arbitrate a dispute who has not previously agreed to do so, but where there is such an agreement the court is empowered to direct compliance with its provisions. *Gores* v. *Rosenthal,* 150 Conn. 554, 557, 192 A.2d 210; *Batter Building Materials Co.* v. *Kirschner,* 142 Conn. 1, 5, 110 A.2d 464; *International Brotherhood* v. *Shapiro,* 138 Conn. 57, 63, 82 A.2d 345.

The defendants claim error in the court's ordering of arbitration because they argue that paragraph 11 of the stockholders' agreement provides the sole remedy when there has been no execution of a new certificate of value. The language relied on states that "the failure to sign any such Certificate shall not invalidate the value set forth in the last Certificate so signed." The defendants submit, therefore, that the plaintiffs cannot be prejudiced by the failure to agree on a new certificate. We do not accept this line of reasoning. The defendants overlook paragraphs 9 and 10 of the agreement, which provide that in the event of the death of any male member heading a "Family Unit", i.e. Ginsberg, Mainthow, Trehub and Goodman, "the Corporation shall be obligated to buy and the legal representatives of the decedent's estate and members of the decedent's

Family Unit shall be obligated to sell all the stock of the Corporation comprising the decedent's Family Unit." At the time of the trial, Ginsberg was sixty-three years of age. The defendants Mainthow, Trehub and Goodman were in their forties. Consequently, having in mind the vicissitudes and uncertainty of life, the necessity of having a current certificate of value in force is readily apparent, and especially so with regard to the plaintiffs. If they are correct in their claim that the value per share is more than the $115 offered by the defendants, then they are certainly prejudiced. Reasonably construed, the provision in paragraph 11, which continues the validity of the last signed certificate of value until a new one is signed, was intended to guard against some contingency which might prevent the timely signing of an annual certificate. The provision cannot be used as a club to force submission where there is a genuine controversy as exists here.

Another error assigned claims that the court should have allowed Mainthow to testify about his intention at the time the agreement was signed. When asked by his counsel whether he intended that "this issue of [a] certificate [of] value should be arbitrated," the plaintiffs' counsel objected on the ground that "the agreement is the best evidence and speaks for itself." The court sustained the objection. This ruling was correct. The agreement must be construed "according to the intention of the parties as expressed in the language used in the document itself, rather than according to the intention which may have existed in the mind of . . . [any one] of the parties." *Foley* v. *Foley,* 149 Conn. 469, 471, 181 A.2d 607; *Ives* v. *Willimantic,* 121 Conn. 408, 411, 185 A. 427; cf. *Connecticut Union of Tele-*

*phone Workers* v. *Southern New England Telephone Co.,* 148 Conn. 192, 200, 169 A.2d 646. There was no claim made at the time of the offer of this evidence that the words used in the stockholders' agreement were ambiguous or of doubtful import. See *Perkins* v. *Corkey,* 147 Conn. 248, 252, 159 A.2d 166.

The defendants' assignment of error contending that the court erred in finding, without evidence, certain paragraphs of the finding is lacking in merit.

There is no error.

In this opinion the other judges concurred.